IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. KUHFAHL

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

DAVID J. KUHFAHL III, APPELLANT.

Filed July 23, 2019.    No. A-18-892.

Appeal from the District Court for Lancaster County: ANDREW R. JACOBSEN, Judge. Affirmed.

Timothy S. Noerrlinger, of Naylor & Rappl Law Office, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Matthew Lewis for appellee.

RIEDMANN, ARTERBURN, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Following a trial, a jury convicted David J. Kuhfahl III of first degree sexual assault of a child and the court sentenced Kuhfahl to 25 to 30 years' imprisonment. Kuhfahl appeals, challenging the sufficiency of the evidence to support his conviction and alleging ineffective assistance of counsel. We affirm.

## II. STATEMENT OF FACTS

In November 2017, an information was filed charging Kuhfahl with first degree sexual assault of a child. See Neb. Rev. Stat. § 28-319.01 (Reissue 2016). The jury trial began in June 2018. After the jury was impaneled, but outside of their presence, the court held a Neb. Evid. R. 404 hearing to determine the admissibility of testimony by the victim that Kuhfahl showed her a pornographic video prior to sexually assaulting her. See Neb. Rev. Stat. § 27-404 (Reissue 2016).

Kuhfahl claimed the evidence was inadmissible character evidence while the State claimed that the evidence was admissible because the evidence was inextricably intertwined with the offense. After hearing testimony from the victim, the court found the evidence of the pornographic video was admissible as it was inextricably intertwined with the offense.

## 1. Trial

At trial, the State called witnesses including the 15-year-old victim who was the daughter of Kuhfahl's girlfriend; Christina Willis, the victim's mother and Kuhfahl's girlfriend; and Gregory Lear, who was a friend of Willis and Kuhfahl and who was present at the time of the alleged sexual assault. On his behalf, Kuhfahl called his mother and his sister as alibi witnesses.

The evidence at trial established that the victim's date of birth was in December 2001, and Kuhfahl's date of birth was in October 1979. The evidence further established that, on the evening of March 15, 2017, the victim and Willis stayed overnight at Lear's apartment. There was conflicting testimony by the victim, Willis, and Lear, regarding whether Kuhfahl also spent the night at the apartment and where the parties slept. The parties were also not in agreement on the time when everyone woke up on the morning of March 16; however, the evidence was uncontroverted that, on March 16, the victim was at Lear's apartment.

### (a) Victim's Testimony

The victim testified that her mother, Willis, and her father had split up prior to her birth. In the victim's words, her father had custody of her "on and off. I was a state ward or in his custody." Near the end of February or the beginning of March 2017, she testified she came to live with Willis in Lincoln "[b]ecause my dad was refusing me." By March, she and Willis were living in a one-bedroom apartment belonging to Lear. Kuhfahl and Willis had been dating for years and Kuhfahl sometimes stayed with them in Lear's apartment.

The victim testified that, when she woke up on March 16, 2017, Willis had already left for work. The victim stated that she went to the living room of Lear's apartment and found Lear and Kuhfahl playing video games. After the victim began playing the video game, Lear left the living room to go take a shower. While playing the video game, the victim heard a sexual moaning sound coming from Kuhfahl's tablet. Although the victim tried to ignore the sound, she eventually turned around and Kuhfahl showed her a pornographic video that he was watching. Even though the victim quickly turned away, Kuhfahl told her that he was watching stepfather and daughter pornography and that it was his favorite kind of pornography. The victim testified that this made her feel uncomfortable because she looked up to Kuhfahl as a stepfather. The victim continued to attempt to play her video game, but Kuhfahl repeatedly put the tablet in her field of vision.

According to the victim, Lear, who had not yet showered, walked into the living room at which point Kuhfahl turned down the volume on the tablet. After Lear left, Kuhfahl again attempted to show pornography to the victim, but the victim tried to look away. The victim testified that Kuhfahl then touched her thigh over her clothing after which he put his hand up her shirt and felt her breasts, first over, then under, her bra. Lear again came into the living room and Kuhfahl quickly pulled his hand away from the victim and sat back on the couch.

The victim testified that she asked Lear if she could shower and got up off the couch, but Kuhfahl called her over to talk with him. When she did not comply, he threatened to tell Willis that she was not listening to him. The victim then complied because she was concerned if Kuhfahl told Willis she was not listening to him, Willis would ground her. Lear again left the room, after which time Kuhfahl tried again to make her watch pornography, and when she tried to get up, he grabbed her by the wrist, sat her down on the couch, and covered her with a blanket from the waist down. He then put his hand down her pants and digitally penetrated her vagina. The sexual assault ended after Lear re-entered the room.

Lear approached the victim later that day and she told him what had occurred. At some point in the next three days, the victim told her mother that Kuhfahl had sexually assaulted her. On cross-examination, Kuhfahl's counsel asked whether the victim had simply indicated to Willis that Kuhfahl had touched her in the vaginal area, the victim replied "no" that "[i]t was a whole description but more summarized" and that she did not leave anything out of her description. In August 2017, the victim was interviewed at a Child Advocacy Center (CAC) in Colorado. During this interview, she stated that Kuhfahl had touched both the inside, and outside, of her vagina.

### (b) Gregory Lear's Testimony

Lear testified that, on the date in question, when he entered the living room, Kuhfahl suggested multiple times that Lear "hurry up, take a shower, we have some fun." Lear testified that he observed the victim on the couch with a blanket on top of her and Kuhfahl had his arm underneath the blanket. Lear testified that Kuhfahl had "a little funny look on his face." and Lear "was thinking what was [Kuhfahl] talking about, hurry up, take a shower and have some fun . . . . It didn't seem right." Lear continued to look in on Kuhfahl and the victim and described Kuhfahl as "sitting there, like, I ain't doing nothing but something funny, suspicious, looks like something is going on." Lear described that Kuhfahl was looking at a tablet that the victim was holding and that Kuhfahl's hand appeared to be in the area of the victim's vagina and was moving in a circular motion. Shortly thereafter, Lear realized Kuhfahl was touching the victim's vagina. Unsure of what to do, Lear testified that he told the victim to "go ahead, take a shower." Later that day, Lear talked to the victim about what he had seen and offered to tell Willis, which the victim said she preferred to do.

### (c) Christina Willis' Testimony

Willis testified that on March 16, 2017, during the daytime hours while she was at work, she and Kuhfahl text messaged each other about doing something that evening to celebrate their dating anniversary. Willis testified that, later that evening, she and Kuhfahl got into an argument because she was upset that they did not end up going out for their anniversary.

The day following the incident, the victim told Willis about the sexual assault. Willis testified she immediately ended her relationship with Kuhfahl. In response, Kuhfahl asked "what did I do?" and Willis responded "you touched my daughter." Willis testified that, in response to her accusation, Kuhfahl stated "he couldn't believe -- he was more, like, I did what?" Willis testified that Kuhfahl did not deny the sexual assault instead stating that "it was one of his other personalities."

The court received into evidence, without objection, exhibits 9 through 24, which were text messages sent through Facebook Messenger between Lear and Kuhfahl, and exhibits 28 through 61, which were text messages sent through Facebook Messenger between Willis and Kuhfahl. The text messages quoted in this opinion are unedited.

*(i) Text Messages Between Kuhfahl and Lear*

On the morning of March 18, 2017, Lear and Kuhfahl began an extended text message conversation that lasted into the afternoon. Lear texted Kuhfahl "She Didnt Like What Doing To Her She Olny 15 Still Kid Dont Fuck With Her Ok." That afternoon Kuhfahl responded asking if Lear had deleted the texts he had sent earlier, denied anything had happened, and again asked Lear to delete all text messages that Lear had sent to him. Lear responded "I Know She Told Me She Didnt Like Its She Wanted Tell." Kuhfahl replied that nothing happened, that the victim wanted Willis to leave him, and the victim had previously lied about similar things. When Lear texted that he was right there and saw what Kuhfahl had been doing, Kuhfahl again asked Lear to delete all the text messages he had sent and "not talk about it." Lear did not delete the text messages. Kuhfahl further stated that he thought he would leave town because the victim did not want him dating Willis. Later that afternoon, Kuhfahl texted Lear stating that he "almost passed out again" and:

> I think I have been having memory spills lately so I think I'm going to stop smoking because I remember bits and pieces of the day [Willis] and I fought on her anniversary at your place I don't remember most of the day I barely remember drinking a 40
>
> My head has been all tingly like I'm going to pass out for a couple days now I've been passing out off and on and then catching myself before I fell in the bathroom I barely remember playing video games or anything.
>
> I just passed out I was trying not to when [Willis] left then I stood up slowly and started to walk felt dizzy spells and fell back on the bed don't know how long I passed out for.
>
> [Lear]: Yeah
>
> [Kuhfahl]: Yeah I don't remember much about my last few days man I feel really shaky hands like a really bad high so I think I'm going to stop smoking because it messing with my seizures badly.
>
> [Lear]: Ok?

Lear testified that he placed the question mark at the end of this last response "because [Kuhfahl] don't have seizures." The following evening, Kuhfahl texted Lear:

> You may think I'm trying to make excuses but I honestly don't remember what happened
>
> I know I lost a lot of trust with you but I really don't remember anything that happened that is why I'm going to get help for my mental illness so that I never have times I can't remember what I did ever again and I'm not trying to make any excuses at all I truly don't remember what happened at all[.]

*(ii) Text Messages Between Kuhfahl and Willis*

Text messages between Willis and Kuhfahl were received into evidence as exhibits 28-61. These texts began on March 19, 2017. Willis testified that before she learned about the assault, Kuhfahl told her something about "slipping into different personalities." She asked when he realized he was "missing time" and he responded that he did not remember, and implied that he did not remember very much from the day of, and the days surrounding, the assault. As their conversation continued, Kuhfahl talked about starting medication, about demons trying to control him, and his need to "kill the other side of me that is evil." Following the incident, Willis and Kuhfahl continued texting and, during one of their text conversations, Willis informed Kuhfahl that she started dating Lear 7 days after they broke up. Kuhfahl continued to maintain that it was another personality that assaulted the victim and that he had no memory of the assault.

### (e) Defense Evidence

Kuhfahl's mother and sister both testified that, on March 16, 2017, Kuhfahl and his sister were procuring an air conditioning unit for their mother's residence. Kuhfahl's mother testified that she was in the house the entire day and believed that Kuhfahl did not leave except with his sister. Kuhfahl's sister testified that, she left for class at 1 p.m. returning at 5 p.m. and Kuhfahl was still at their mother's residence.

On cross-examination, Kuhfahl's sister admitted that, although an investigator had contacted her about the case and questioned her, she never told the investigator that Kuhfahl was with her that day. Additionally, on cross examination, defense counsel asked Kuhfahl's mother if it would surprise her that the high temperature on March 15, 2017, was 46 degrees. She responded that the kitchen, dining room, and living room areas got hot due to the sun shining through the window and the heat from cooking. Kuhfahl's mother further testified that because of her allergies, it was not pleasant to open the window or go outside.

### 2. VERDICT AND SENTENCING

The jury found Kuhfahl guilty and, thereafter, the court sentenced him to 25 to 30 years' imprisonment. Kuhfahl obtained different counsel to represent him at sentencing and that counsel continues to represent him on appeal.

### III. ASSIGNMENTS OF ERROR

Kuhfahl contends that there was insufficient evidence to sustain his conviction and that his trial counsel provided ineffective assistance. The Nebraska Supreme Court recently stated that assignments of error regarding ineffective assistance of counsel raised on direct appeal must specifically allege deficient performance, and an appellate court will not scour the remainder of the brief in search of such specificity. *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019). In *Mrza*, the Supreme Court scoured the brief for the appellant and inferred specific assignments of error, but stated it would not do so in the future. Following the Supreme Court's lead, because the brief for the appellant in this case was filed before *Mrza* was released, we scour the brief for the appellant for specificity in this case. Kuhfahl alleges that counsel was ineffective by: (1) failing to

impeach the victim regarding her prior inconsistent statements and actions; (2) failure to impeach the State's witnesses regarding their bias towards him; (3) failure to interview or call Marie Sanchez as a witness to impeach the State's witnesses; and (4) failure to object to the admission of exhibits 9 through 24 (Facebook text messages between Lear and Kuhfahl) and exhibits 28 through 61 (Facebook text messages between Willis and Kuhfahl).

## IV. STANDARD OF REVIEW

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Mora*, 298 Neb. 185, 903 N.W.2d 244 (2017). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id*.

## V. ANALYSIS

### 1. INSUFFICIENCY OF EVIDENCE

Kuhfahl contends that the evidence is insufficient to support his conviction. In support of this assignment, Kuhfahl points to several inconsistencies within the testimonies of the State's witnesses and argues that his witnesses' testimony was consistent and should have been believed. Kuhfahl argues that the testimony by the State's witnesses contained too many inconsistencies to support his conviction. For instance, Kuhfahl claims that the victim initially reported being touched by Kuhfahl and it is not until later that she disclosed that he digitally penetrated her. Kuhfahl also argues that the testimony given by the State's witnesses presented different accounts of where people slept in the residence on the night before the incident; the time they woke up on the day of the incident; and the color of the blanket Kuhfahl used to hide his hand while he was assaulting the victim. Although Kuhfahl was free to argue to the jury that these differences in the witnesses' accounts rendered their testimony unreliable, these arguments go to the credibility of the witnesses, which we do not consider. An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019).

We further note that the evidence adduced by the State was sufficient to support Kuhfahl's conviction. Kuhfahl was convicted of first degree sexual assault of a child. A person commits first degree sexual assault of a child:

> (a) When he or she subjects another person under twelve years of age to sexual penetration and the actor is at least nineteen years of age or older; or

(b) When he or she subjects another person who is at least twelve years of age but less than sixteen years of age to sexual penetration and the actor is twenty-five years of age or older.

§ 28-319.01. Neb. Rev. Stat. § 28-318(6) (Reissue 2016) defines "sexual penetration" as:
sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical or nonhealth purposes. Sexual penetration shall not require emission of semen.

The evidence at trial established that the victim was born in December 2001, and Kuhfahl was born in October 1979. Thus, the evidence established that Kuhfahl was 37 years old, and the victim was 15 years old, at the time of the offense. Further, the victim testified that Kuhfahl subjected her to touching including her thigh and breast which progressed to Kuhfahl penetrating the victim's vagina with his finger. Although corroboration of a sexual assault victim's testimony is not required, see Neb. Rev. Stat. § 29-2028 (Reissue 2016), in this case, Lear described seeing Kuhfahl's hand under the blanket moving in the area of the victim's genitals as she described. Thus, the evidence adduced by the State was sufficient to support Kuhfahl's conviction of first degree sexual assault of a child. Accordingly, this assignment of error fails.

2. INEFFECTIVE ASSISTANCE OF COUNSEL

Kuhfahl alleges that his trial counsel was ineffective by (1) failing to impeach the victim regarding prior inconsistent statements and actions, (2) failing to impeach the State's witnesses regarding their bias towards him, (3) failing to interview or call Sanchez as a witness to impeach the State's witnesses, and (4) failing to object to the admission of exhibits containing hearsay.

Kuhfahl is represented by different counsel on direct appeal. Recently, in *State v. Munoz*, 303 Neb. 69, 79-80, 927 N.W.2d 25, 34-35 (2019), the Nebraska Supreme Court succinctly set forth the general principles relating to claims of ineffective assistance of counsel raised on direct appeal when the defendant is represented by different counsel:
When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record, otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question. The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice, or that trial counsel's actions could not be justified as a part of any plausible trial strategy.
Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, [466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984),] the

defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

If an evidentiary hearing is required, then the claim will not be addressed on appeal. *State v. Hill*, 298 Neb. 675, 905 N.W.2d 668 (2018).

### (a) Failure to Adequately Impeach Victim

Kuhfahl argues that his trial counsel failed to adequately impeach the victim. Specifically, he contends that defense counsel failed to adequately cross-examine the victim regarding (1) her different versions of the events which she related to Willis, to the CAC, and at trial and (2) "inconsistencies in her direct testimony at trial and her earlier testimony at a 404 hearing regarding who provided her with a game control device on the morning of March 15, 2017." Brief for appellant at 14. The record on direct appeal is sufficient to address this claim.

During cross-examination, defense counsel questioned the victim regarding her reports of the sexual assault to Willis, to the CAC in Colorado, and at trial. Kuhfahl does not identify any specific failures by defense counsel in cross-examining the victim other than vague allegations of failing to adequately confront or impeach the victim "regarding her initial report of digital fondling prior to indicating that she was digitally penetrated in his cross-examination." Brief for appellant at 14. Contrary to Kuhfahl's assertion, our review of the record establishes that defense counsel cross-examined the victim regarding each of her reports. In so doing, the victim testified as to what she reported to Willis, the CAC in Colorado, and at trial, and contrary to Kuhfahl's assertion, her reports did not change from one of fondling to one of penetration.

Further, we have reviewed the 404 hearing and determine that the victim did not testify at that hearing regarding who provided her with a game control device. Since the victim did not testify at the 404 hearing regarding who provided her with the game control device, it follows that there can be no inconsistency with her trial testimony on this issue. Accordingly, because the record refutes these allegation of ineffective assistance of counsel, this claim of ineffective assistance fails.

### (b) Failing to Impeach Witnesses Regarding Bias

Kuhfahl also alleges that trial counsel failed to properly cross-examine Lear and Willis concerning their bias towards him. He claims that counsel: (i) should have better established a timeframe of when Lear and Willis started dating; (ii) failed to adequately cross-examine Willis and Lear regarding their relationship prior to March 16, 2017; and (iii) failed to adequately question Willis regarding a fight with Kuhfahl. Kuhfahl also alleges defense counsel should have questioned the victim as to when Willis and Lear started dating and about the nature of their relationship prior to March 16. The record on appeal is sufficient to address these claims.

### (i) Timeframe of Relationship

First, regarding Kuhfahl's argument that his trial counsel should have better established the timeframe of when Lear and Willis started dating, a timeline was clearly established by the evidence adduced at trial. Lear testified that he and Willis started dating a week or so after Kuhfahl assaulted the victim. A text from Willis to Kuhfahl stated that she started dating Lear 7 days after she broke up with Kuhfahl. Thus, contrary to Kuhfahl's argument, the record establishes the timeline of when Lear and Willis started dating. This allegation of ineffective assistance of counsel fails.

### (ii) Cross-Examination of Witnesses Regarding Relationship

Second, Kuhfahl alleges counsel failed to adequately cross-examine Lear and Willis about their relationship prior to March 16, 2017. Again, contrary to Kuhfahl's argument, the record establishes that defense counsel cross-examined both Lear and Willis regarding their relationship. Lear denied having a previous relationship with Willis, but admitted that he and Willis had sex "a long time ago" which he described as "a few years" ago. Further, Willis testified that she had sex with Lear three times prior to March 16 but that it was at Kuhfahl's suggestion for a threesome. Additionally, Kuhfahl's counsel cross-examined the victim regarding the nature of Willis and Lear's relationship. Thus, this allegation of ineffective assistance of counsel also fails.

### (iii) Failure To Cross-Examine Willis

Third, Kuhfahl alleged counsel should have cross-examined Willis about a fight that occurred between himself and Willis on March 14, 2017. The record establishes that the couple fought because they did not go out to celebrate their anniversary. Although Kuhfahl's counsel did not further cross-examine Willis regarding the March 14 fight, Kuhfahl does not allege what testimony his counsel would have obtained from Willis if he had cross-examined her or how it would have differed from Willis' direct testimony on the subject. Accordingly, without any particularity as to how cross-examination on subject matter that came in through direct examination was deficient, Kuhfahl has failed to sufficiently allege this claim of ineffective assistance of counsel.

### (iv) Failure to Adequately Cross-Examine Victim

Finally, Kuhfahl alleges counsel should have cross-examined the victim regarding Willis and Lear's relationship prior to March 16, 2017, and that counsel should have asked the victim when Willis and Lear began dating. Kuhfahl does not allege what testimony his counsel would have obtained from the victim if he had cross-examined her on these issues. Accordingly, Kuhfahl has failed to sufficiently allege this claim of ineffective assistance of counsel.

### (c) Failure to Call Sanchez

Kuhfahl alleges that he told his counsel that Willis made a statement to Sanchez that she was going to "set up" Kuhfahl and that Willis allegedly told Sanchez that she was lying about Kuhfahl assaulting the victim. Kuhfahl contends that counsel failed to investigate or call Sanchez as a witness. The record does not contain sufficient evidence to resolve this claim on direct appeal.

### (d) Failure to Object to Admission of Text Messages

Kuhfahl alleges that his counsel was ineffective for failing to object to the admission of text messages between himself and Willis and between himself and Lear. He argues that the majority of the exhibits were hearsay because they do not contain any admissions and were irrelevant.

Pursuant to Neb. Rev. Stat. § 27-801(4)(b)(i) (Reissue 2016), a statement is not hearsay if "[t]he statement is offered against a party and is . . . his own statement." See *State v. Henry*, 292 Neb. 834, 875 N.W.2d 374 (2016). Contrary to Kuhfahl's argument, the test messages between Kuhfahl and Willis and Kuhfahl and Lear contained statements of Kuhfahl offered against Kuhfahl and were not hearsay. Statements made by Willis and Lear to which Kuhfahl responded were likewise admissible to give context to Kuhfahl's admissions. See *State v. Stubbendieck*, 302 Neb. 702, 924 N.W.2d 711 (2019) (in prosecution for crime of assisting suicide, entire text message history between defendant and another party provided context to their relationship as it related to victim and to defendant's actions surrounding victim's death). Further, because the text messages indicate blame-shifting and culpability by Kuhfahl governing the direct subject matter at issue in this case, they were relevant to the charges against him. Trial counsel was not ineffective for failing to raise an objection which would have been unsuccessful. See *State v. Huerta*, 26 Neb. App. 170, 917 N.W.2d 175 (2018) (any objection by trial counsel to evidence on relevance grounds would not have been successful and trial counsel was not ineffective for failing to raise unsuccessful objection). Accordingly, this claim of ineffective assistance of counsel fails.

## VI. CONCLUSION

In sum, we find that the evidence was sufficient to support Kuhfahl's conviction. Kuhfahl's claims of ineffective assistance of counsel fail except for his claim that counsel was ineffective for failing to investigate and/or call Sanchez as a witness, due to the record on appeal being insufficient to address this claim. Accordingly, Kuhfahl's conviction and sentence are affirmed.

AFFIRMED.